duct of a juror, he can sit silent until verdict rendered, and then if the verdict shall be against him, can be heard to urge such misconduct as a ground for setting aside the verdict. As, for example, suppose a juror communicates a willingness to accept a bribe, and the party pays him a bribe, and the bribe proves ineffectual, and there is an adverse verdict, can the party who has thus dealt with the juror ask for the benefit of a new trial, basing his application upon the corrupt act of the juror? As I understand the rule upon this subject, it is enforced for the benefit and protection of those who are themselves innocent of any participation in the misconuuct complained of. It is true that in the present case the juror's visit to these premises was not brought about, nor originally induced, by any act of the defendant. The juror was there of his own volition, and was there when the defendant first met him; but the defendant at once lent his encouragement and co-operation to the act of the juror, and, as I have said, accompanied him over the premises, pointed out different objects upon the premises to which the testimony on the trial related, and conversed with him about particular parts of the establishment which they were then mutually observing. Clearly, both parties—the juror and the defendant— were equally in flagrante delicto. For this offense against the proprieties of judicial investigation, punishment has been inflicted upon one; and now to grant a new trial because of such offense, would be to reward the other, when both are alike culpable. For I cannot but regard both as alike at fault, since the defendant, finding the juror on the premises, actively aided and facilitated him in his examination of the scene of the res gestæ. It is impossible for me to believe that the defendant supposed that the juror had a right at that time to visit and examine the establishment, and his subsequent silence touching the occurrence until after the verdict, looks strongly like a purpose, originally, not to divulge the circumstance unless the verdict should be unfavorable. By his own course of action as a participant in the misconduct of the juror, I think he has foreclosed his right to ask that the verdict be set aside because of such misconduct. No other conclusion is, in my judgment, reconcilable with a regular and proper administration of the law, and I find no authority that supports a contrary determination in such a state of the case.

Motion for a new trial denied.

NOTE. The test of prejudice to a party from misbehavior of a juror is this: Was his misbehavior such as to make it probable that his mind was influenced so as to render him an unfair and prejudiced juror? If the misbehavior appear, the disclaimer of the juror should be wholly disregarded. And it is of no importance whether or not the court thinks the verdict was right. Pool v. Railroad Co., 6 Fed. 844.

SEAMEN SENT HOME BY CONSUL — SERVICES ON PASSAGE—ASSAULT WITH DANGEROUS WEAPON.

1. Where a distressed American seaman was sent home on board of an American vessel by the consul from a foreign country: Held, that he was bound to do duty as a seaman when called upon by the mate, although his passage had been paid by the American consul.

2. The mate had a right to order such seaman to do duty, unless directed to the contrary by the master of the vessel.

3. If such seaman was unable to do duty, the onus probandi lay upon the seaman to show his inability when called upon to do duty.

4. A prisoner indicted for an assault with a dangerous weapon on another, on the high seas on board of an American vessel, under the act of March 3, 1825, § 22 [4 Stat. 121], would be guilty of the offence charged if he could have reached the person intended to be assaulted by extending his arm so as to inflict a blow, although no blow was actually given.

5. The person who flourishes or points a deadly weapon at another, intending personal harm, is guilty of an assault within the act of congress, although no battery had been committed.

6. The pointing of loaded fire-arms with an intent to commit injury, is an assault, although the parties stand at a great distance, provided the distance is such that personal injury may be inflicted by the discharge of such fire-arms.

The prisoner was indicted under the act of congress passed March 3, 1825 (section 22), for an assault with a dangerous weapon, to wit: a knife of the length of 12 inches, and of the breadth of 2 inches, done and committed upon the mate of the American packet ship called the "Mediator," on a voyage upon the high seas from the port of London, in the kingdom of Great Britain, to the port of New York. The act in substance declares, that if any person or persons upon the high seas, or in any arm of the sea, or in any river, haven, creek, basin, or bay within the admiralty jurisdiction of the United States, and out of the jurisdiction of any particular state, on board any vessel belonging to the whole or in part to the United States, or any citizen or citizens thereof, shall, with a dangerous weapon, commit an assault on another, such person shall on conviction thereof, be punished by fine not exceeding $3,000, and by imprisonment and confinement to hard labor not exceeding 3 years, according to the aggravation of the offence.

It appeared in evidence that the prisoner was a distressed seaman and consular man, sent home by the American consul at London to the United States. The act gives the consul the right and makes it his duty to send home American seamen who are destitute and found in a foreign country. See the act of congress passed February 28, 1803, § 3 [2 Stat. 203]. And it is also made the duty of the seamen so sent home, to perform such service on board of the vessels bringing them

to the United States, as they shall be able to perform according to their several abilities. And by the same act the masters of vessels are to receive a sum not exceeding $10 for each person so sent home by the consuls, vice-consuls, commercial agents, and vice-commercial agents of the United States. In this case, two or three days after the Mediator had left London, while on her voyage, the 2d mate, while forward, ordered the prisoner to take up a knife and scrape off the tar from some of the buckets belonging to the ship. The prisoner had not thus far been put on duty, but he had lived in the forecastle, and was sitting down at his ease on the spar on the deck of the vessel, smoking his pipe, when the order was given. The prisoner was directed to proceed aft, man the hatchways, and do the duty. He got up reluctantly; indeed, one witness testified that he refused to do the duty pointed out to him. The 2d mate then seized him by the neck, and gave him a strong shove forward. He appeared to have pushed the prisoner about three or four feet from him. The prisoner then drew his knife and turned to the mate, threatened to stab him, and told him he would do so if he did not let him alone. One of the crew then took up a hand-spike, and threatened to knock down the prisoner if he did not go aft and perform the duty; whereupon the man retreated aft. The witness called for the government was here cross-examined by the prisoner's counsel. He stated that when the prisoner drew the knife, and threatened to stab the mate, he was about three or four feet from him; that he flourished his knife, and told him he would cut him open if he approached him.

The counsel for the prisoner and the United States respectively summed up to the jury.

The counsel for the prisoner submitted that the mate was the aggressor. That he had no right to call upon the prisoner to do duty in the manner he did, unless by the order of the captain. That the mate had assumed to put the man on duty without the captain's orders, and the prisoner in such a case was not bound to obey. The counsel also urged, that it had not been shown that the man was able to do duty, within the meaning of the act of congress. That the prisoner, although he had drawn his knife and flourished it at the mate, yet he was not guilty of having committed an assault upon the mate, within the meaning of the act of congress. That in order to bring the prisoner within the act, he must first have been within reaching distance of the mate, so as to have inflicted the blow upon him if he designed it. That the assault, if committed within reaching distance, must have been made in such a manner as that the jury would be bound to infer circumstances of force and harm, in respect to the mate or the person assaulted. There should be such acts of violence, or such threats, menaces, signs or gestures, as might give ground to the person assaulted to apprehend some in-

jury or danger of his person while standing in the defence of himself. In this case the mate had shoved the prisoner, and the fair inference was that he had shoved him beyond the reach of the knife, when the prisoner turned upon the mate, and it then became optional with the mate whether he would come to closer quarters or not. He certainly was not bound to do so, and that therefore the prisoner was entitled to an acquittal.

The district attorney, for the United States, contended that the prisoner clearly had been guilty of an assault with a dangerous weapon; that he was bound to have done duty when called upon by the mate; that the prisoner should have proved on trial his inability to have done the duty required of him, if that was his excuse.

A. Nash, for prisoner.
The District Attorney, for the United States.

THE COURT thereupon charged the jury that distressed American seamen, who are sent home, are bound by law to render what assistance they can in the ship's service, while on their passage, and this, although their passage is paid by the United States. That in the present case, the order of the mate appeared to have been a proper one, and the mate had the right to call on the prisoner to do duty on shipboard, unless the captain had ordered to the contrary. That in case the prisoner refused to do duty, the officer had the right to remove or send him aft in a mild manner. That the pushing in this case did not appear to have gone beyond the line of duty on the part of the mate. The court said that they would not undertake to lay down any definite rule how near the parties must be to each other, to enable one of them to commit an assault upon the other, within the meaning of the act of congress; and with a dangerous weapon, no battery need be proved to have been committed; the assault alone was sufficient; that if the parties stood 20 feet apart, the prisoner could not have been guilty of an assault in this case, but had he held a loaded pistol or gun, and pointed it at the mate in a threatening attitude and manner, he would have been guilty of an assault within the act, even had the parties stood at a great distance, so long as the distance was such that execution or harm might arise to the mate from the discharge of the fire-arms. He said that, in the present case, the mate had sworn, that the prisoner was three or four feet from him; that is, he had shoved the man forward three or four feet when he took him by the collar. The prisoner had committed no battery upon the mate, but if the prisoner was so near the mate as to have been able to have inflicted a blow upon the mate with his knife, had he so intended by extending his arm the length of it, he was clearly guilty in law of

the assault, and ought to be convicted; but should the jury be of the opinion, that the prisoner stood at such a distance from the mate when he drew his knife and flourished it, that he could not have possibly reached him, the prisoner was not guilty in law of the offence charged in the indictment.

The jury thereupon retired, and returned a verdict of not guilty.

---

## Case No. 16,215.

UNITED STATES v. SALLY.

[Cited in Re Crittenden, Case No. 3.393. Nowhere reported; opinion not now accessible.]

---

## Case No. 16,216.

UNITED STATES v. The SALLY MAGEE.

[4 Int. Rev. Rec. 134.]

District Court, S. D. New York. Oct., 1866.

PRIZE—LIEN FOR SEAMEN'S WAGES.

[Seamen on board a prize captured and condemned as enemy property have no lien for wages, as against the title of the United States and the rights of the captors.]

In admiralty.

BETTS, District Judge. The above vessel was seized on the high seas in July, 1861, by a ship of war of the United States, at a time of public war between the United States and the rebel states or Confederate States; and in the term of August following, the said vessel and her cargo were proceeded against in this court, by public prosecution, and a decree of condemnation and forfeiture of the vessel and her cargo, as prize of war, was rendered by the court therein, on the first day of the said term of August. [Cases Nos. 12,259 and 12,260.] On the 10th day of August, 1863, the claimants appealed the said cause to the supreme court of the United States, and that court in December term, last past, affirmed the decree of this court in the original cause in all respects. [3 Wall. (70 U. S.) 451.] On the 6th of October last the officers and crew of the aforesaid prize vessel filed their joint petition in this court, alleging they were "loyal officers of the United States at the time they were employed on board of and in the service of said bark, and so continued to the time of her capture in this cause: that they were not knowingly and willingly employed on board the said vessel in hostility to the United States, and that they are advised, and believe, they have an interest in, and lien upon, said bark, her tackle, apparel, furniture and cargo, or the proceeds of the sale thereof, as a security for the wages due to them, respectively, as aforesaid, and the said liens are prior to the claims of the libelants."

No lien for, or priority of right of payment of wages to the crew of the bark in this case, for their services upon the vessel, was imparted to them by the contract of hiring, or accrued by implication therefor. The Sally Magee, 3 Wall. [70 U. S.] 451; 13 Stat. 306, § 10. The ship and cargo were both enemy's property, and the legal title and interest therein was vested exclusively in the United States, on their seizure as prize in this action, and then passed, absolutely, by force of the prize act, above cited, to the captors. The owners of the ship, after she became enemy's property, could authorize no lien or disposal of the vessel or cargo in derogation of the higher and older title of the captors of her as prize of war, and the crew of her, equally with all outside creditors, must resort to and rely alone upon the individual responsibility of their particular debtors. Upton, Mar. Law (2d Ed.) 153, 158. The petitioners accordingly have no right, of course, against the property for the recovery of their wages, seized at sea and condemned as lawful prize of war, and in no way legally exonerated from liability to such seizure.

The act of congress of March 3, 1863 (12 Stat. 762), protecting certain liens upon vessels during the war, does not extend to cases of the class embraced in the present cause. The Sally Magee [supra]. Accordingly there is no statutory law authorizing the lien claimed by the petitioners. Petition denied.

[See, also, Case No. 12,261.]

---

UNITED STATES v. SALMON. See Case No. 14,820.

---

## Case No. 16,216a.

UNITED STATES v. SAMPERYAC et al.

[Hempst. 118.] [1]

Superior Court, Territory of Arkansas. Feb., 1831.[2]

EQUITY — FEIGNED ISSUES — BILL OF REVIEW — PLEADING — FRAUD — ADMISSIONS — DECREE PRO CONFESSO — ASSIGNABILITY OF DECREES — CONVEYANCE—INNOCENT PURCHASERS.

1. It rests in the sound discretion of the chancellor to award a feigned issue, or not; and it is done to enable him to obtain additional facts, and to arrive at a satisfactory conclusion on the facts of the case.

2. The verdict of the jury on a feigned issue is not conclusive, for the chancellor may have tried again and again, and may even decree against a verdict.

3. Where there is sufficient proof to enable the chancellor to decide, the parties should not be subjected to the delay and expense of a trial at law.

4. The act of May 26, 1824 (4 Stat. 52), confers on this court the powers of a court of chancery, for the purpose of trying the validity of claims mentioned in that act, and a bill of review may be maintained therein.

5. A bill of review lies either for error in law, appearing on the face of the decree, or for new material matter, that has come to light afterwards, and which could not have been used at the time the decree was made.

---

[1] [Reported by Samuel H. Hempstead, Esq.]
[2] [Affirmed in 7 Pet. (32 U. S.) 222.]